UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SONIA SMITH                                                                                           PLAINTIFF

V.                                                            CIVIL ACTION NO. 3:20-CV-244-DPJ-FKB

MISSISSIPPI EMERGENCY                                                              DEFENDANT
MANAGEMENT AGENCY

ORDER

This matter is before the Court on a Motion for Summary Judgment [60] brought by Defendant Mississippi Emergency Management Agency ("MEMA") as to Plaintiff Sonia Smith's Title VII and § 1981 claims. MEMA argues that Smith's claims for race-based and retaliation-based termination from employment must be dismissed because she neither exhausted nor pleaded a race-based termination claim; she cannot maintain her § 1981 claims against a state agency; and she cannot create a genuine issue as to whether her discharge was based on race or retaliation. The Court finds that the race claim fails for procedural reasons, but the retaliation claim survives MEMA's motion.

I.      Factual Background

Smith, who is African American, began working for MEMA on April 1, 2015, as the division director over grants; she was promoted on August 1, 2018, to accounting-and-finance director. Smith Dep. [60-1] at 47, 59, 61. Smith was selected for promotion by Office Director of Support Services Crystal Thompson (white) and Deputy Director Stephen McCraney (white), though McCraney had final approval. *See id.* at 59; McCraney 30(b)(6) Dep. [62-14] at 17.[1] Among other duties, Smith's new role required her to review and approve all accounts payable

---

[1] Deposition pagination is used throughout.

and handle payroll and travel matters.  Smith Dep. [60-1] at 317 (Ex. 11 Job Description); *id.* at 67.

Soon after Smith started her new position, several conflicts emerged between her and Thompson.  On May 3, 2019, Thompson issued Smith two formal reprimands and a poor performance-development assessment (PDA).  *See* State Ct. R. Part 1 [1-1] at 41–44 (Compl. Ex. G) (the two reprimands); *id.* 27–40 (Compl. Ex. F) (the PDA).  One reprimand admonished Smith for allowing a contract to lapse.  *Id.* at 41–42 (Compl. Ex. G).  The second said she had failed to "clean up" MB3, *id.* at 43–44, MEMA's internal approval system for encumbering funds in response to purchase requisitions, Smith Dep. [60-1] at 109, 233; Thompson 30(b)(6) Dep. [62-18] at 168.

Both violations were deemed "Group III, Number 14 offense[s]": "acts of conduct . . . of such nature that to continue the employee in the assigned position could constitute negligence in regard to the agency's duties to the public or other State employees."  State Ct. R. Part 1 [1-1] at 41 (Compl. Ex. G); *accord id.* at 43–44.  References to the two violations were laced throughout the PDA, which additionally chastised Smith for, among other offenses, "not respect[ing] her superiors and ha[ving] no respect for authority within the Agency."  State Ct. R. Part 1 [1-1] at 30 (Compl. Ex. F); *see id.* at 31, 34, 35, 37 (explicit references to MB3); *id.* at 31–32, 37 (explicit references to the Atkins Contract).

On May 10, Thompson discovered that Smith had forwarded a work-related email to her private email address.  Thompson 30(b)(6) Dep. [62-18] at 104; *see* Smith Dep. [60-1] at 330 (Ex. 20).  Thompson reported Smith's conduct to McCraney, who called Chief Information Officer Bob Buseck, instructing him to seize the computer in Smith's office.  McCraney 30(b)(6) Dep. [62-14] at 90; Buseck Dep. [60-2] at 12.  Buseck did so.  Buseck Dep. [60-2] at 42.  On the

same day, Smith filed an internal grievance complaining of harassment and a hostile work environment. State Ct. R. Part 1 [1-1] at 45–50 (Compl. Ex. H).[2]

On Tuesday, May 14, Angie Plunkett, Smith's direct supervisor, texted Smith, telling her (without elaboration) not to return to work. Smith Dep. [60-1] at 245–47. McCraney subsequently sent Smith a letter detailing that she was suspended with pay due to unstated allegations. State Ct. R. Part 1 [1-1] at 51 (Compl. Ex. I). On May 22, Smith finalized an EEOC charge complaining of a hostile work environment and race-based compensation. Smith Dep. [60-2] at 182, 187–88; *see* State Ct. R. Part 1 [1-1] at 52 (Compl. Ex. J 1st EEOC Charge). That same day, McCraney sent Smith another letter, finding her email practice to constitute a Group III offense and notifying her of a pre-disciplinary conference to discuss her three Group III offenses. State Ct. R. Part 1 [1-1] at 53–55 (Compl. Ex. K). Smith replied on June 11, 2019, addressing the charges and again complaining of a hostile work environment and harassment. *Id.* at 56 (Compl. Ex. L).

The following month, on July 17, 2019, McCraney sent Smith a termination letter. *Id.* at 69 (Compl. Ex. P). Smith responded with a second EEOC charge on August 26 relating to the termination of her employment. State Ct. R. Part 2 [1-2] at 42 (Compl. Ex. R). After receiving her notice of right to sue, Smith filed this suit in state court, alleging a variety of state and federal claims. The case was removed to this Court based on federal-question jurisdiction. Along the way, Smith dropped all but her Title VII and § 1981 claims for racial discrimination and retaliation.

---

[2] It is not clear whether the computer seizure or the complaint occurred first. But viewing the evidence in the light most favorable to Smith under Rule 56, the Court assumes the grievance came first because it did not mention the computer incident.

II.     Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  It must "interpret all facts and draw all reasonable inferences in favor of the nonmovant."  *EEOC v. Rite Way Serv.*, 819 F.3d 235, 239 (5th Cir. 2016); *accord Tolan v. Cotton*, 572 U.S. 650, 660 (2014).  But conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial.  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754,

4

759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)); *accord Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

III.     Analysis

MEMA's opening memorandum was chiefly devoted to Smith's race-based hostile-work-environment and retaliatory-discharge claims under Title VII and § 1981. But Smith clarified in her Opposition Memorandum that she is not asserting a hostile-work-environment claim. Pl.'s Opp'n Mem. [63] at 11–12. Instead, her claims are now limited to race-based and retaliation-based termination. *See id.* at 35 ("All of these facts above together, one can leave with the impression that Ms. Smith was terminated due to her race."); *id.* at 13 (noting Smith's intent to make a prima facie race-discrimination claim on the basis of the fact that "[s]he was terminated from her job"); *id.* at 36 (describing retaliation claim). Given that announcement—and the fact that the race-based termination claim was not apparent from the Complaint—MEMA unsurprisingly raised several new arguments in its Reply. The Court therefore allowed Smith to file a sur-reply and MEMA a sur-reply response. *See* Order [76].

### A.     Race-Based-Termination Claim

MEMA raised three new issues in its Reply: (1) whether Smith had properly alleged race-based termination in her Complaint, and, if not, whether she can assert a new claim in response to a summary-judgment motion, Def.'s Reply [70] at 2 n.1, 5; (2) whether she failed to exhaust her race-based-termination claim through the EEOC, *id.* at 9–12; and (3) whether Smith can maintain her race claims under § 1981 against an arm of the state, *id.* at 4 n.4.

It was never clear that Smith blamed the termination on race. For example, she filed two EEOC charges of discrimination. The first was filed before the termination and alleged a race-based hostile work environment. State Ct. R. Part 1 [1-1] at 52 (Compl. Ex. J 1st EEOC

Charge). After she was fired, she filed a second charge, adding, "I believe I have been discriminated against because of my race (Black) and in retaliation in violation of Title VII . . . . I believe I was discharged ***solely because I complained of a protected activity***." State Ct. R. Part 2 [1-2] at 42 (Compl. Ex. R 2d EEOC Charge) (emphasis added). Consistent with that statement, Smith checked the box on the charge form indicating "retaliation" as the only basis of her termination-related charge of discrimination; she did not check the box for "race." *Id.*

Her Complaint in this suit only added to that ambiguity. Like the two EEOC charges, she appeared to blame racism for the hostile work environment and retaliation for the termination. Despite filing a 111-paragraph complaint, she never said MEMA terminated her employment based on her race, and she offered no facts suggesting that her termination was based on race. Instead, the race-related averments were linked to pre-termination conduct, and the closest she comes to explaining the reason for the termination is her averment that, after her termination, she requested and "received the Charge of Discrimination ***for Retaliation***." State Ct. R. Part 1 [1-1] ¶ 48 (Compl.) (emphasis added).

Given her EEOC Charge stating that retaliation was the "sole[]" basis for the termination and the failure to ever say in the Complaint that the termination was based on race, it is not apparent Smith ever intended this claim until she responded to MEMA's summary-judgment motion. State Ct. R. Part 2 [1-2] at 42. That would be too late for all the reasons discussed in cases like *Rich v. Sheppard*, No. 3:16-CV-366-DPJ-LRA, 2018 WL 4344563, at *5 (S.D. Miss. Sept. 11, 2018).

But even assuming she exhausted the race-based termination claim and minimally pleaded it, MEMA noted in reply that Smith disavowed any such claim in her deposition:

> Q: Okay. And it's your belief that because you filed an EEOC charge, you were terminated.

6

> A: Yes.
>
> Q: Okay. Anything else that you believe caused your termination?
>
> A: The EEOC file that I filed. Yeah, the EOC case, that's why they terminated me. Because I filed the EOC case, yes.

Smith Dep. [62-2] at 293–94.

Smith argues in response that she mentioned race 13 times in her deposition. Pl.'s Sur-Reply [79] at 5. That's true, but each time she discussed race while describing pre-termination events, and she never once testified that the termination was based on race. She was also repeatedly asked to discuss the claims she was still pursuing because Smith confirmed during her deposition that she had abandoned many of her original claims. A race-based-termination claim never came up.

After MEMA's examination, Smith's attorney questioned Smith regarding her remaining claims, but she neither retracted nor clarified her testimony that the termination claim was premised solely on retaliation. Instead, the testimony seemed to confirm that race was blamed for the hostile work environment and retaliation was blamed for the termination. The follow-up examination began with a question about the May 22, 2019 EEOC Charge of Discrimination for race-based hostile work environment (a claim Smith had not yet waived when the deposition was taken):

> Q: You signed with the EEOC on May 22nd, 2019, *is your race discrimination*. Correct?
>
> A: Right. Correct, yes.
>
> Q: *And then you were fired* July the –
>
> A: -- 17th.
>
> Q: Of --

  A: -- 2019.

  Q: -- 2019.  Right after they had notice about your complaint with EEOC.

  A: Yes.

  Q: Which you had a right to do.  And you were terminated by MEMA after that.

  A: Yes.

  . . . .

  Q: And by that time they had notice – by the time you wrote to him on June 5th, they already had notice of your EEOC complaint.

  A:  Yes.

  Q:   All right.  And, also, the attorney, Ms. Johnson, asked you about these other claims you have.  The only claims you're submitting that you have would be a Title VII and a 42 USC 1981 based on race and retaliation.  Correct?

  A: Yes.

  Q: All right.  As far as your state law claims, you know that I dismissed those, and the only thing you're going forward with – let's just be clear -- is a Title VII under race and retaliation --

  A: Yes.

  Q: -- and 42 USC race and retaliation.

  A: Yes.

  Q: 42 USC 1981 race and retaliation.

  A: Yes.

Smith Dep. [62-2] at 305–07.  Smith never testified that the termination was based on her race, and it would have been easy enough to correct her earlier testimony that retaliation was the sole basis for that claim.  She never did, and it does not appear that MEMA questioned Smith regarding race-based discharge.

  So, even if Smith administratively exhausted and adequately pleaded a race-based termination claim, she abandoned it.  And, as MEMA argues, it would be prejudiced if Smith

were allowed to assert claims beyond the "charges she filed with the EEOC, what she explicitly pled in her Complaint and what she swore to in her deposition." Def.'s Reply [70] at 3. Summary judgment is therefore granted as to the race-based termination claims under Title VII and § 1981.[3]

### B. Retaliation Claim

Smith asserts a circumstantial case of retaliatory discharge, which triggers analysis under the three-step *McDonnell Douglas* framework. *See Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005) (per curiam). First, a plaintiff must create a genuine issue of material fact as to each element of the appropriate *prima facie* case. *Id.* at 341. Second, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse action]." *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577 (5th Cir. 2020) (quoting *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004)). If provided, the plaintiff must create a genuine issue of fact as to whether the adverse action was illicitly motivated. *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016). The "'ultimate' burden of persuasion . . . 'remains at all times with the [employee],' [but] the failure of a party to meet its burden of production at each step may allow judgment against that party." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 235–37 (5th Cir. 2016) (quoting *Tex. Dep't Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

Establishing the prima facie retaliation claim requires plaintiff

> to show: "(1) that [she] engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." We have interpreted Title VII's opposition clause to mean that a plaintiff engages in protected activity when she

---

[3] The § 1981 claim fails for an additional reason: "Congress has not chosen to abrogate the states' immunity for suits under [§] 1981[.]" *Hines v. Miss. Dep't of Corr.*, No. 00-60143, 2000 WL 1741624, at *3 (5th Cir. 2000) (holding that arm of the state was entitled to immunity from claim under § 1981); *accord Tate v. Zaleski*, No. 2:19-CV-0063-KS-MTP, 2020 WL 1881350, at *3 (S.D. Miss. Apr. 15, 2020).

complains of an employment practice that she "reasonably believes" violated Title VII.

*Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 618 (5th Cir. 2020) (citations omitted) (first quoting *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003); and then quoting *EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 240 (5th Cir. 2016)).

MEMA originally contested whether Smith had satisfied the third element (causation). Def.'s Supp. Mem. [61] at 15.  But it now appears to concede that the close temporal proximity between the protected activity (Smith filing her first EEOC charge) and the adverse employment action at issue (her termination) may be sufficient to meet this prong.  Def.'s Reply [70] at 23. The Court agrees.  *See generally Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 241–43 (5th Cir. 2019) ("At the prima facie case, a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action.").

The burden therefore shifts to MEMA to produce a legitimate, non-retaliatory reason for firing Smith.  MEMA says it fired Smith for three Group III offenses:  allowing a contract to lapse; failing to "clean up" certain aspects of its MB3 system; and sending work-related emails to her home computer.  There is no dispute that this justification satisfies MEMA's burden.

Smith must therefore establish pretext.  Broadly, pretext may be suggested "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (quoting *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010)); *see Ellerbrook v. City of Lubbock*, 465 F. App'x 324, 333–34 (5th Cir. 2012) (per curiam) (providing a non-exclusive list of pretext-establishing methods).  A plaintiff is not limited to evidence of a certain type, *Ellerbrook*, 465 F. App'x at 334, and the pretext inquiry must consider the "record

as a whole," *Stennett v. Tupelo Pub. Sch. Dist.*, 619 F. App'x 310, 316 (5th Cir. 2015) (per curiam) (quoting *Reeves*, 530 U.S. at 151).

MEMA cites three work-rule violations to support its decision. Smith substantively addresses all three, but there is a question of fact whether Smith would have been fired after the first two infractions because she was allowed to return to work. The Court will therefore focus on the third violation (sending work emails to her personal email address) because that violation appears to be the tipping point, without which the termination would not have occurred.

Smith says that MEMA did not have a policy that prohibited forwarding emails to private accounts. Pl.'s Opp'n Mem. [63] at 16. She also contends that her "reason for forwarding emails to her personal email account was to allow her to work at home on grants" and alleges that others who similarly forwarded emails to their personal emails were not punished. *Id.*

MEMA's decisionmakers have struggled to contradict her statement. Asked to point to a specific policy prohibiting Smith's conduct, the ultimate decisionmaker (McCraney) could not, though he was "sure Bob Buseck[,] the IT Director[,] c[ould]." McCraney 30(b)(6) Dep. [62-14] at 105; *see id.* at 102, 104. Buseck pointed to section 5.12 of the Mississippi Employee Handbook, which defines "State property" as including information recorded on electronic data sources, Buseck Dep. [60-2] at 32, and he noted that "the State owns all property," *id.* at 33. *See* Miss. Emp. Handbook § 5.12 [62-8] at 1.

An employer is certainly free to interpret its own policies, but the fact that the proffered rules never directly address Smith's actions may explain why no one seemed to know they were prohibited. Plunkett, Smith's direct supervisor, and Nicole Pressley, her coworker, both testified that they had forwarded MEMA emails to their personal accounts. Plunkett Dep. [62-10] at 142 (distinguishing the emails she forwarded as not containing any personnel information); Pressley

11

Dep. [62-5] at 71–72. Several other employees testified that they had never heard of a prohibition on forwarding emails and that they had never heard of a coworker having been punished pursuant to such a rule. Pressley Dep. [62-5] at 71, 74; Rhoads Aff. [62-12] ¶¶ 5–6; Mixon Aff. [62-11] ¶¶ 5–6; Williams Aff. [62-13] ¶¶ 5–6. Even a former two-term director of MEMA swore in his affidavit that he "would not have considered it a breach of confidentiality for an employee to forward documents to their personal email account to work from home to ensure a timely response and completion of critical tasks." Latham Aff. [62-9] ¶ 9.

This is similar to what happened in *Reynolds v. Alabama Department of Transportation*, where an employee was suspended under a "novel" interpretation of a rule the employer had "never before investigated, much less suspended, an employee" for violating. 4 F. Supp. 2d 1068, 1086 (M.D. Ala. 1998). The court held that the plaintiff had demonstrated pretext for race-based discrimination. *Id.*

MEMA says Smith's practice is different because she had personal—not work-related—reasons for forwarding the work emails. Def.'s Reply [70] at 18–19, 19 n.14. Section 5.12 of the Mississippi Employee Handbook explicitly prohibits employees from "using State property for personal use." Miss. Emp. Handbook § 5.12 [62-8] at 1. And Smith testified that she meant to preserve the emails to defend herself against potential charges of incompetence. Def.'s Reply [70] at 18–19, 19 n.14 (citing Smith Dep. [62-2] at 261); *see, e.g.*, Smith Dep. [62-2] at 260.

But MEMA's argument weakens its case because it offers no evidence that it *knew* Smith forwarded emails for personal reasons before it made the termination decision. The argument is based on Smith's post-termination deposition, and Buseck testified that he did not investigate Smith's purpose and was unable to say whether Smith used the emails for personal reasons. Buseck Dep. [60-2] at 34. "[A] purported reason that only comes to light after the decision to

12

terminate has been made cannot be the real reason for termination." *Bennett v. Consol. Gravity Drainage Dist. No. 1*, 648 F. App'x 425, 430 (5th Cir. 2016) (examining *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 238 (5th Cir. 2015) ("A purported reason for a decision that postdates the actual decision is necessarily illegitimate.")).

Finally, MEMA argues that there is no causation because it was already in the process of terminating Smith's employment when it learned that she filed the first of two EEOC charges on May 22, 2019. An adverse employment action cannot—as a matter of common sense—be caused by something that has not yet happened. But here, the final termination decision came after the EEOC charge. On May 22, 2019, Smith finalized her EEOC charge regarding an alleged race-based hostile work environment. Smith Dep. [60-2] at 182, 187–88; *see* State Ct. R. Part 1 [1-1] at 52 (Compl. Ex. J 1st EEOC Charge). That same day, McCraney wrote Smith stating that a "pre-disciplinary" conference had been set for June 11; he gave Smith an opportunity to respond to the alleged violations in writing. State Ct. R. Part 1 [1-1] at 53–55 (Compl. Ex. K). Smith replied on June 11, asserting that Thompson and Plunkett had created a hostile work environment. *Id.* at 56–65 (Compl. Ex. L). The actual termination did not occur until July 17, 2019. State Ct. R. Part 1 [1-1] at 69 (Compl. Ex. P).

Thus, while it is unclear when MEMA made the final termination decision, if McCraney's letter was forthright, MEMA was still conducting a "pre-termination" investigation when it learned that Smith had engaged in protected activity. State Ct. R. Part 1 [1-1] at 53–55 (Compl. Ex. K). The Court therefore finds a question of fact on causation. *See Wilder v. Stephen F. Austin State Univ.*, No. 9:20-CV-00040-ZJH, 2021 WL 3288303, at *14 (E.D. Tex. Aug. 2, 2021) (finding question of fact on causation where defendant argued that "the decision to terminate her had already been set in motion," but final decision came after protected activity).

In sum, "[t]he issue at the pretext stage is whether [the employer's] reason, even if incorrect was the real reason for [the plaintiff's] termination." *Goudeau v. Nat'l Oilwell Varco*, 793 F.3d 470, 476 (5th Cir. 2015) (quoting *Sandstad v. CB Richard Ellis Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)). Considering the record as a whole—including the doubt Smith has created as to the email rationale and MEMA's post-hoc attempt to salvage that rationale—the Court finds that Smith has met her burden and created a genuine issue of pretext.[4]

IV. Conclusion

The Court has considered all arguments; those not addressed would not alter the results. For the stated reasons, the Court finds that MEMA's summary-judgment motion [60] should be denied as to the retaliatory discharge claim under Title VII and granted as to all other claims. Given the holdings in this Order, Smith's Motion to Strike [71] is denied as moot.

This action was previously removed from its pretrial conference and trial setting, pending resolution of the motions. The parties are directed to contact Courtroom Deputy Shone Powell to reset the trial and pretrial conference.

**SO ORDERED AND ADJUDGED** this the 8th day of March, 2022.

        s/ *Daniel P. Jordan III*
        CHIEF UNITED STATES DISTRICT JUDGE

---

[4] That said, "even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'a better course would be to proceed to a full trial.'" *Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986)). This case should proceed to trial.